[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 31, 2005
THOMAS K. KAHN
CLERK

_____

No. 05-10586
Non-Argument Calendar

_____

BIA Nos. A96-101-609 & A96-102-146

JAVIER MORALES,
CLAUDIA LILIANA JIMENEZ,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent..

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

**(August 31, 2005)**

Before BIRCH, HULL and WILSON, Circuit Judges.

PER CURIAM:

Javier Morales and his wife, Claudia Liliana Jimenez (collectively the

"petitioners"), petition for review of the Board of Immigration Appeals's ("BIA's")

order affirming the Immigration Judge's ("IJ's") denial of asylum and withholding of removal under the Immigration and Nationality Act ("INA"). We **AFFIRM**.

## I. BACKGROUND

On or about 1 May 1999, Morales, a native and citizen of Colombia, was admitted to the United States as a nonimmigrant visitor for pleasure, with authorization to remain until 31 October 1999. Jimenez, Morales's wife and also a native and citizen of Colombia, was admitted to the Untied States as a nonimmigrant visitor for pleasure on or about 12 August 1999, with authorization to remain until 11 February 2000. On 24 December 2002, the petitioners were served with Notices to Appear, charging them with removability under 8 U.S.C. § 1227(a)(i)(B) for remaining in the United States for a time longer than permitted.

On 31 October 2002, Morales filed an application on behalf of himself and Jimenez for asylum and withholding of removal under the INA.[1] He alleged that he had suffered past persecution and harbored a well-founded fear of future persecution on the basis of his political opinion. Specifically, Morales claimed that the guerrilla group Fuerzas Armadas Revolucionaries de Colombia (the "FARC")

---

[1] Additionally, Morales claimed in his application that he and Jiminez were eligible for relief under the United Nations Convention Against Torture and Other Cruel, Inhumane, and Degrading Treatment or Punishment ("CAT") , 8 C.F.R. § 208.16(c). However, the petitioners did not raise an argument on this issue in their appellate brief, and we thus do not consider it here. Mendoza v. United States Att'y Gen., 327 F.3d 1283, 1286 n.3 (11th Cir. 2003).

threatened him with kidnaping and death because of his prior military service in the Colombian army and political involvement with the Liberal Party.

In a hearing before the IJ, Morales testified to the following facts.[2] Morales joined the Colombian army on 7 January 1990. While in the army, he served as a plain-clothed intelligence agent tasked with collecting information on guerrilla movements. Morales learned that a guerrilla group was planning to transport munitions down the El Rageri river in the summer of 1990. Acting on this information, Morales's unit seized the munitions and captured fifteen guerrillas. He was discharged from the army on 28 December 1990.

In 1995, Morales joined the Colombian Liberal Party. He spent every Saturday campaigning in the neighborhoods of Bogota to recruit new members. On 6 February 1998, Morales was attending a Liberal Party community hall meeting, and ten armed guerrillas from the FARC entered the community hall and asked Morales and his companions for their identification cards. They were held for three hours while the guerillas checked their IDs against information the FARC had on file. According to Morales, the guerilla reviewed the IDs because they wanted to ascertain the identities of those involved in political parties that support

---

[2] Morales's testimony before the IJ closely tracks the facts recited in his application for asylum.

democracy in Colombia. Before leaving the hall, the guerillas returned Morales's ID and informed him that they knew about his 1990 army service.

On 11 May 1998, Morales received a threatening phone call from the FARC. The FARC told Morales that they knew that he had participated in the army operation in the El Rageri and that he was going to pay with his life for his actions against the guerrillas. Between May and September 1998, Morales received eight phone calls from the FARC in which they threatened to kidnap and kill him. In September 1998, Morales traveled alone to the United States and remained for six months in hopes that his absence would abate the threats. Morales returned to Colombia on 11 March 1999, and resumed living with his wife in their home in Bogota. Three days later, FARC guerillas called Morales at his home and told him that they knew he had returned to Colombia and that he would pay for what he had done in the army. Morales became "very fearful and very nervous." Administrative Record ("AR") at 69. On 1 May 1999, Morales traveled to the United States, and his wife joined him in the following August.

When asked why it had taken them so long to file for asylum, Morales explained that soon after his wife arrived in the United States, they had consulted an immigration attorney. According to Morales, the attorney failed to inform them about the asylum process and instead suggested that they return to Colombia and

apply for a professional visa for Jimenez from there. The petitioners located a company that would sponsor Jimenez for the professional visa. However, when they returned to the attorney's office in the fall of 2000, they discovered that attorney had closed his office. Other than speaking to Morales's brother about getting a professional visa, the petitioners did not explore other ways of staying in the United States legally. Morales first found out about the asylum process when his wife's uncle mentioned it to him.[3]

The record also contained four documents discussing country conditions in Colombia generally. First, the record included the Department of State's 2002 Country Report on Human Rights Practices for Colombia. The Country Report indicated that Colombia's human rights record remained poor and that "the internal armed conflict between the Government and the leftist guerrillas, particularly the FARC and terrorist organization National Liberation Army ("ELN")–as well right-wing paramilitaries . . . caused the deaths of between 5,000 and 6,000 civilians during the year . . . ." Id. at 86. In 2002, the FARC committed more large-scale massacres than in the previous year, and 85% of all civilian deaths in massacres were attributed to guerrillas. Id. at 89. Additionally, "[t]he FARC committed

---

[3] The record contained various documents supporting Morales's factual allegations. As Morales's credibility is not at issue, we need not discuss these documents here.

numerous politically motivated kidnapings in an attempt to destabilize the Government and pressure it into a prisoner exchange. . . . [T]here were 208 politically motivated kidnapings during the year." Id. at 90.

Second, the record contained the State Department's Profile of Asylum Claims and Country Conditions for Colombia for June 1997 (the "Profile"). The Profile estimates that 10,000 to 15,000 full-time guerillas, organized into more than 100 groups, exercised "some degree of permanent influence in more than half of the country's municipalities." Id. at 105. The Profile states that "[t]he vast majority (perhaps as high as 90 percent) of asylum claims from Colombia are based on political grounds even in cases where there is little evidence that the political views of the applicant were related to the mistreatment alleged." Id. at 108. The Profile reports that guerrillas committed many human rights violations, including killings and kidnapings, and that any guerilla abuse alleged by asylum applicants "could have occurred or at least would not be inconsistent with the country conditions," id. at 110. However, the Profile also states that those fleeing guerilla persecution in "conflictive zones" of Colombia usually could live peacefully elsewhere in the country. Id. According to the Profile, Bogota is a particularly violent region in Colombia.

Third, the record included a 16 June 2003, State Department's Travel Warning (the "Warning") which states that "[t]errorist and criminal violence by narcotraffickers, guerrillas, illegal self-defense (paramilitary) groups and other criminal elements continues to affect all parts of the country, urban and rural." Id. at 79. It also notes that there were approximate 3,000 reported kidnapings throughout the country in 2002 and that "[t]here is a greater risk of being kidnaped in Colombia than in any other country in the world." Id. Finally, the record contained a State Department's Consulate Information Sheet dated 16 April 2003 ("the CIS"). The information provided in the CIS is consistent with that provided by the Report, the Profile, and the Warning.

After listening to the testimony at the hearing and considering the evidence, the IJ denied the petitioners' asylum and withholding of removal claims and ordered them removed to Colombia. First, the IJ found that no extraordinary circumstances existed so as to excuse petitioners' untimely filing of their asylum applications. The IJ noted that the petitioners arrived in 1999 but did not apply for asylum until 31 October 2002. The IJ stated that "[t]he most that the Court has heard as far as an explanation [for waiting to file the application] is that they did contact an attorney in the community, that attorney suggested to them that they file an employment based petition on behalf of the consolidated respondent." AR at

33. The IJ noted that there was no evidence that they had been ill-advised by the attorney, that they had actually retained the attorney to file an asylum application, or that there were health or other problems that prevented the petitioners from filing a timely application. Therefore, the IJ found their claim for relief under Section 208 was time barred.

Second, although it determined that Morales's testimony was credible overall, the IJ found that Morales had failed to meet his burden of proof in establishing that it would be more likely than not that his life or freedom would suffer on account of any of the grounds enumerated under Section 208. The IJ found that the petitioners were not victims of past persecution because (1) the petitioners had not been physically or psychologically harmed; (2) Morales had received just eight threatening phone calls during a brief period in 1998; and (3) at the 6 February 1998 Liberal Party meeting, Morales suffered no harm and was released after the FARC checked his papers. Additionally, the IJ wondered why the FARC would have allowed Morales to leave their presence if they truly had an interest in him. The IJ also noted that Morales did not apply for political asylum during his 1998 United States trip after having been contacted by the guerrillas.

Acting through counsel, the petitioners appealed the IJ's decision to the BIA. In their brief before the BIA, the petitioners argued that Morales had shown that he

was entitled to withholding of removal because Morales was being persecuted based on his membership in a protected social group[4] because the FARC targeted Morales on account of his prior military service, the reach of guerillas extended to all parts of the country, and the Colombian government was unable to control the guerrillas. Notably, the petitioners did not challenge the IJ's ruling that the asylum application was time-barred. The BIA adopted and affirmed the IJ's decision.

## II. DISCUSSION

On appeal, the petitioners argue that the BIA erred in denying their application for asylum and withholding of removal because Morales has established he suffered past persecution and has a well-founded fear of persecution on the basis of a political opinion imputed upon him by the "FARC" on account of his prior service with the Colombian army.[5]

When the BIA summarily affirms the decision of IJ without an opinion, we review the IJ's decision as the final removal order. Sepulveda v. United States Att'y Gen., 401 F.3d 1226, 1230 (11th Cir. 2005) (per curiam). We review the IJ's

[4] In their appellate brief, the petitioners do not raise this enumerated ground, membership in a protected social group. Instead, the petitioners' brief relies on the ground of imputed political opinion, as did the original asylum application.

[5] Because the petitioners' removal proceedings commenced after 1 April 1997, the permanent rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ("IIRIRA"), govern their petition for review. See Gonzalez-Oropeza v. United States Att'y Gen., 321 F.3d 1331, 1332 (11th Cir. 2003) (per curiam).

factual determinations under the highly deferential substantial evidence test. Under

this test, we "must affirm the [IJ's] decision if it is 'supported by reasonable,

substantial, and probative evidence on the record considered as a whole,'" Al

Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (citation omitted), and

we can reverse the IJ's decision "only if the evidence 'compels' a reasonable fact

finder to find otherwise." Sepulveda, 401 F.3d at 1230 (citation omitted). To the

extent that the IJ's ruling is based on the interpretation of applicable statutes, we

review de novo. Mazariegos v. United States Att'y Gen., 241 F.3d 1320, 1324

(11th Cir. 2001).

A.    Jurisdiction over the Petitioners' Asylum Claim

Generally, an alien must file an application for asylum within one year of

his arrival in the United States. 8 U.S.C. § 1158(a)(2)(B). The IJ may

nevertheless consider an untimely asylum application "if the alien demonstrates to

the satisfaction of the Attorney General either the existence of changed

circumstances which materially affect the applicant's eligibility for asylum or

extraordinary circumstances relating to the delay in filing an application . . . ."

§ 1158(a)(2)(D). A court may review a final order of removal only if the alien has

exhausted all administrative remedies available to the alien as of right.[6]  8 U.S.C. §

1252 (d)(1).

In this case, the petitioners failed to raise before the BIA their argument that

their failure to file a timely asylum application should be excused.  Accordingly,

the petitioners have failed to exhaust their administrative remedies, and we lack

jurisdiction to hear their argument. § 1252(d)(1).  We therefore dismiss the

petition as to the petitioners' asylum claim.

B.      Withholding of Removal

To obtain withholding of removal, an alien must "establish that his or her

_____

[6] The INA provides that "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)" of 8 U.S.C. § 1158(a). § 1158(a)(3).  We have recognized that, pursuant to this section,"the Attorney General's decision regarding whether an alien complied with the one-year time limit or established extraordinary circumstances, such that the time limit should be waived, is not reviewable by any court."  Fahim v. United States Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002) (per curiam).

Effective 11 May 2005, the REAL ID Act amended portions of 8 U.S.C. § 1252.  The REAL ID Act states, in relevant part:

(a) IN GENERAL. – Section 242 of the Immigration and Nationality Act (8 U.S.C. 1252) is amended--
(1) in subsection (a)--
. . .
(iii) by adding at the end the following:
(D)  JUDICIAL  REVIEW  OF  CERTAIN  LEGAL  CLAIMS.--Nothing  in subparagraph (B) or (C), or in any other provision of this Act (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section."

REAL ID Act of 2005, Pub. L. No. 109-13, § 106(a), 119 Stat. 231, 310 (2005).  Section 106(a) of the REAL ID Act may put the continued viability of Fahim and similar cases into question.  However, we need not address this issue here because we dismiss on other grounds the petitioners' petition as to his asylum claim.

life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.16(b). If it is determined that the alien suffered past persecution in his native country on account of his political opinion, we presume that his life or freedom would be threatened in the future if he were removed to his country of origin. § 208.16(b)(1)(i). However, an alien who has not suffered past persecution still may establish a future threat to his life or freedom if he can "establish that it is more likely than not that he . . . would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country," and that the threat cannot be reasonably avoided by relocation within the home country. § 208.16(b)(2).

Although the INA does not explicitly define "persecution," we have recognized that "[n]ot all exceptional treatment is persecution," Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000), that "persecution . . . requir[es] more than a few isolated incidents of verbal harassment or intimidation," and that "[m]ere harassment does not amount to persecution." Sepulveda, 401 F.3d at 1231 (internal quotations omitted). As a general rule, "behavior . . . must threaten death, imprisonment, or the infliction of substantial harm or suffering" in order to

qualify. Sharif v. INS, 87 F.3d 932, 935 (7th Cir. 1996); see Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2000) (persecution "must rise above unpleasantness, harassment, and even basic suffering"). "Threats alone generally do not constitute actual persecution; only rarely, when they are so immediate and menacing as to cause significant suffering or harm in themselves, do threats per se qualify as persecution." Vatulev v. Ashcroft, 354 F.3d 1207, 1210 (10th Cir. 2003); see also Sepulveda, 401 F.3d at 1232 (menacing telephone calls and threats did not constitute past persecution). The well-founded fear inquiry requires the alien to demonstrate that his or her fear of persecution "is subjectively genuine and objectively reasonable." Sepulveda, 401 F.3d at 1231.

In this case, we conclude that substantial evidence supports the IJ's finding that the petitioners did not suffer past persecution. The FARC's threats, consisting of a total of nine threatening phone calls, while upsetting, does not constitute persecution. See Sepulveda, 401 F.3d at 1232. Additionally, we hold that substantial evidence supports the IJ's finding that the petitioners did not have a well-founded fear of future persecution because they failed to meet their burden of establishing that it would be more likely than not that their lives or freedoms would suffer on account of any of the enumerated grounds. The petitioners failed to demonstrate that their fear of persecution is subjectively genuine and

13

objectively reasonable. If the FARC had wanted to kidnap or kill Morales, they could have easily done so at the 6 February 1998 Liberal Party meeting that they interrupted; however, the FARC chose to release Morales unharmed. Additionally, the petitioners did not flee immediately after Morales received a threatening phone call upon his return in March 1999, but instead, took two months to sell all their belongings before coming to the United States. Because substantial evidence supports the BIA's conclusion, we deny the petition for review as to the petitioners' claim for withholding of removal.

### III. CONCLUSION

Because we lack jurisdiction to hear the petitioners' challenge as to the IJ's denial of their asylum claim as untimely, and because substantial evidence supports the BIA's conclusion as to the denial of their withholding of removal claim, we **DISMISS** the **PETITION IN PART** and **DENY** the **PETITION IN PART**. _____